**Affirmed and Memorandum Opinion filed November 20, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00442-CV

## IN THE INTEREST OF T.M.T., A CHILD

---

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2013-05601J**

---

## M E M O R A N D U M    O P I N I O N

Appellant W.M.M. (Mother) appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her child T.M.T. (Tina).[1] The trial court terminated Mother's rights on the predicate grounds of endangerment of the child and Mother's failure to comply with a family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E) & (O) (West Supp. 2017). The trial court further found that

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

termination of Mother's rights was in the child's best interest, and named the Department managing conservator of the child.

In two issues Mother challenges the factual sufficiency of the evidence to support the trial court's findings on endangerment, and that termination is in the best interest of the child. Because we conclude the evidence is factually sufficient to support the trial court's findings, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. 2013 Referral

#### A. Removal Affidavit

When Tina was just over one year old the Department received a referral noting that Tina suffered serious medical issues while Mother suffered serious mental health issues that would prevent her from caring for the child. On the date of the referral Tina was admitted to Memorial Hermann Children's Hospital with symptoms consistent with brain trauma. The referral stated that Mother could not provide an explanation for the brain injury.

When Tina was ready to be discharged from the hospital, the Department explored relative or kinship placement. The Department was unable to find a suitable caregiver, and, due to Mother's mental health issues and the possibility that Mother may have caused the child's injuries, the Department determined that returning the child to Mother would pose risk of additional harm to the child. Subsequent investigation revealed that Mother was not the cause of the child's injuries.

The referral noted that Mother exhibited schizophrenic behavior, specifically Mother heard voices and "clicked," which the referral described as "meaning voices tell her to hurt people." Mother indicated that "she does not want to kill people but she just wants to hit people and hit them until she hurts them." Mother has had

2

multiple psychiatric hospitalizations, and has been treated for violent behavior. An incident was reported in which Mother became agitated with hospital staff to the degree that hospital security was called.

At the time of the referral Mother had stopped seeing a psychiatrist because the psychiatrist told her there were not dead people around and the voices were not real. Mother refused psychiatric medication because she did not like the way it made her feel.

Tina was born at 26 weeks' gestation. The newborn spent approximately eleven months in the hospital due to medical issues from birth. Tina had been discharged from the hospital only two months before the Department referral. Tina was fed through a gastrostomy-jejunostomy tube (GJ tube), had microcephaly, and respiratory distress requiring oxygen. Tina was developmentally delayed and had a seizure disorder.

While Tina was hospitalized, Mother's visits were infrequent; at one point Mother did not come to the hospital for approximately one and a half weeks. Tina was admitted to the hospital in critical condition in September 2013, after Mother did not mix the child's formula properly to be added to the GJ tube, a mistake mother admitted. An MRI revealed acute and chronic subdural hematomas on the child's brain.

The hospital organized private duty nursing for Tina upon discharge. Mother initially refused home health services. After Mother accepted home health services, she was non-cooperative. When home health personnel contacted Mother she told the private duty nurse she would not be home or "she would have other excuses." The child did not receive home health nursing services following her initial hospitalization.

## B.    The Investigation

The Department investigator interviewed Mother at the hospital. Mother reported that she had three children and she was pregnant with another child. Contrary to earlier statements, Mother reported that she had never been diagnosed with any emotional or mental disorder. Mother has asthma for which she uses an inhaler, and takes medication for high blood pressure. Mother reported no alcohol or drug use, and no Department or criminal history.

Mother reported that her family support system was her mother (Grandmother), the child's alleged father, a maternal great grandmother, and maternal great grandfather. Mother was the only person who cared for Tina "because of germs." Mother reported that she administered potassium to Tina through her feeding tube, and Mother demonstrated knowledge of the side effects of the wrong dosage.

Mother reported that Tina had been in the hospital all but three weeks of the child's life. Mother was working at a fast food restaurant, but quit when she learned Tina would be coming home from the hospital. Mother received $357.00 per month in food stamps plus Medicaid. Mother reported that she received $30.00 per month in disability payments for Tina. Mother reported having completed the 11th grade.

Mother reported that doctors at the hospital had intubated Tina against Mother's wishes. Mother reported at least three instances in which the hospital and/or medical staff had treated Tina against Mother's wishes. Mother did not want Tina to remain in the hospital, and wanted her to receive services and therapy at home. Mother was trained on how to change and clean the GJ tube.

One month after the initial referral, Tina was re-admitted to the hospital with high sodium levels and seizures. The hospital's "Consultation Final Report" was

4

sent to the Department investigator and attached to the pretrial removal affidavit. The affidavit summarized a portion of the report as follows:

> Mother's past history of psychiatric hospitalization, her endorsement of schizophrenia diagnoses, her anger management problems, and the fact that mother has not returned to the hospital since admission all raise concern for mother's ability to care for a special needs child. The information that home-health has not been able to contact the mother is indication of medical neglect. [Tina]'s diaper rash and general filth at admission are indicative of physical neglect.

The report continued, noting that Tina's high sodium level most likely was caused by improper formula mixing. "[Tina]'s filth and severe diaper rash on admission, mother's history of [refusal to cooperate with] home health services, the likely dilution of [Tina's] formula, and the possibility of inflicted head trauma warrant ongoing [Department] involvement. . . . We are very concerned that mother will not be capable of adequately meeting [Tina]'s needs when she is finally ready for discharge." The CARE team report further provided:

> [Tina] will require constant care by a person who is capable of monitoring her oxygen and continuous tube feeds, and who is willing to bring the child to multiple outpatient appointments with pediatric subspecialist. To date during this hospitalization, no family member has demonstrated this level of interest, as the child has been alone for the majority of her stay.

When Mother was interviewed at the Department office she denied that Tina had a seizure, her admission of improper mixing of formula, and her diagnosis of schizophrenia. Mother reported that she did not use home health services because she did not have a stable home environment. No other relative placements were viable as Tina required extraordinary medical care and attention.

Despite denying any criminal history Mother had a previous conviction for failure to identify by giving false information.

5

### C. Court-Appointed Child Advocate's Report

The Court-Appointed Child Advocate filed a report in which she noted that Mother was given a family service plan, which she did not complete. Mother completed a course in anger management and individual therapy, but a Child Advocate had been unable to speak with the therapist because Mother did not sign an authorization for release of information. Mother had attended all hearings, family visits, and conferences. In November 2013, Mother tested positive for cocaine and marijuana in a hair follicle test. In March and April 2014, Mother tested positive for marijuana in hair follicle testing.

With regard to Tina's foster placement, a subsequent Child Advocate report stated:

> [Tina] has significant cognitive and physical delays and is placed in a specialized medical needs foster home. Her current placement is able to provide the constant supervision necessary for [Tina] and attend to any and all doctor's appointments. Since her placement, [Tina] has improved in health and development. Although still delayed, through physical and speech therapy she has shown improvement in motor skills and maintaining attention.

With regard to potential relative caregivers, the report noted:

> [Tina] is a very high-need child. She requires constant supervision and consistent medical attention and it is necessary to have a backup caregiver who is able to provide care for [Tina] in case [Grandmother] is unable to do so for any reason. Due to the unclear cause of [Tina]'s injuries, the medical back up should be someone close to the family but not [Mother]. [Mother] should have medical training since she will be around [Tina], but she should not be the primary person that replaces [Grandmother] in her absence.

The Child Advocate concluded with a recommendation that the Department maintain conservatorship and that Tina remain in her foster placement.

6

A subsequent Child Advocate report noted that although Tina is "a medically fragile child who requires a great deal of care," she is active and must be "watched constantly as she frequently pulls out her feeding tube, which must be replaced immediately." The Advocate noted that she did not believe Mother had made Tina a priority. Mother lacked family support in caring for Tina. Grandmother, who was being considered for placement, declined Tina's placement in her home. Grandmother did not complete the necessary medical training to care for Tina. The Child Advocate remained concerned about the risk of harm to Tina if returned to Mother.

### D. Decree Naming Mother Managing Conservator

On March 10, 2016, after a bench trial, the trial court signed a decree terminating Father's parental rights and naming Mother sole managing conservator of Tina.

## II. 2016 Referral

On September 27, 2016, the Department received another referral alleging medical neglect of Tina, who was four years old at the time. The referral noted that Tina had been diagnosed with "Short Gut Syndrome, Chronic Lung Disease, Microcephaly, Seizure Disorder, Verbal Developmental Delays, a history of Subdermal [sic] Hemorrhages and she is G Tube dependent." Mother had missed numerous doctors' appointments for Tina, who had last been seen by her doctor on May 26, 2016. The referral expressed concern for Tina's physical health leading to Tina's death if she did not receive regular medical care.

Mother told the Department investigator that the referral was the same as the earlier referral and that the termination proceeding concluded in her favor. Mother reported that she did not take Tina to her medical appointments because "the nurses

7

don't care to listen to her concerns regarding the way they are taking care of [Tina]." Mother reported she was taking Tina to Texas Children's Hospital instead of Memorial Hermann. Mother claimed that she took Tina to doctors at Texas Children's every three months, but Mother could not name the doctors or the dates of the appointments.

A home health care agency was providing nursing care 16 hours per day, seven days per week. The investigator spoke with one of Tina's private duty nurses. The nurse did not have any concern about Mother's ability to care for Tina's siblings. The nurse confirmed that Tina has special needs, respiratory problems, seizures, pulmonary problems, and was using a GJ tube. Tina received speech therapy and physical therapy at home. Tina was taking several medications for seizures, reflux, and breathing.

Five days after the referral, on October 2, 2016, Tina was admitted to Texas Children's Hospital due to malnutrition and weight loss. A Serious Abuse and Neglect Staffing meeting was held at Memorial Hermann Hospital. In attendance at the meeting were the Department investigations supervisor, Tina's doctors, social work staff, CARE clinic staff, and the Department investigator. Those in attendance at the meeting agreed that it was in Tina's best interest to return her to Memorial Hermann hospital for her care because Memorial Herman had a history of her medical issues. The home health care agency was notified that Tina had an appointment at Memorial Hermann, and the health care agency agreed to provide a nurse to attend the appointment with Tina. A family team meeting was held at which Mother agreed to return Tina to Memorial Hermann.

When Tina was ready to be discharged, the social worker called the Department investigator and explained that Tina could not be discharged until Mother complied with the hospital's recommendation to attend classes where she

could learn to care for Tina. Mother refused to attend the class at the hospital stating that she had to care for other children at home.

Based on Tina's severe medical issues, constant weight loss, numerous missed medical appointments, and Mother's refusal to comply with medical recommendations, the Department sought temporary managing conservatorship of Tina. The trial court granted the Department temporary managing conservatorship and ordered Mother to comply with a family service plan, which required Mother to:

- complete parenting classes in person six to eight weeks in length and provide a certificate of completion to the Department;

- provide the case worker with a copy of the previous psychiatric assessment and follow all recommendations;

- submit to random urinalysis or hair follicle drug testing and test negative at all times;

- acquire and maintain housing that is stable for more than six months;

- participate fully in a drug and alcohol assessment and follow all recommendations; and

- make all efforts to attend court hearings, permanency conferences, family visits, and scheduled appointments.

As to drug testing, Mother tested positive for cocaine and marijuana on March 30, 2017. Mother had two subsequent negative drug tests, but refused to submit to any further drug screening while the parental termination case was pending. Mother was asked to submit to eight more drug tests, which she did not attend.

## III. Trial

At the beginning of trial, the Department offered exhibits that were admitted into evidence without objection. The exhibits included Tina's birth certificate, a paternity registry search, medical records from Memorial Hermann Hospital and Texas Children's Hospital, the Children's Crisis Care Center (4 C's) records,

Father's criminal records, Mother's criminal records, and Mother's drug test results.

Mother, the first witness, testified that Tina was born "with half a gut" and "half a brain." Mother testified that Tina never ate by mouth and lived on a GJ tube. Tina needed physical, occupational, and speech therapy. Mother testified that Tina, five years old at the time, was improving in her walking, but was not on age level.

Mother explained that Tina first came into care in 2013 because the Department was concerned that Mother was not taking Tina to her medical appointments. Mother and the Department worked for two years in which time Mother completed the services in her family service plan and did everything the Department asked her to do, which resulted in Mother regaining custody in 2016.

Mother admitted that Tina came into the care of the Department again in 2016 because Tina "was having issues that were endangering her life[.]" Mother testified that she took Tina to every medical appointment that she knew about. Despite positive drug tests for cocaine and marijuana during the first termination proceeding and the 2016 proceeding, Mother testified that she never used drugs. Mother admitted that Tina had gained weight in foster care. Tina's failure to gain weight in Mother's care was one of the reasons for the Department referral.

Mother believed that if she had been allowed to increase the amount of food Tina was receiving and move her to Texas Children's Hospital, Tina would have improved under her care. Mother had attended some classes as required by the family service plan, but "dropped out" of classes recommended as a result of the drug assessment. Mother believed if she received training on how to care for her daughter she would be able to do so. This testimony directly contradicts that of hospital staff who reported that Mother repeatedly refused offers of medical training.

Mother testified that since Tina was removed she had a job for a while, but

10

lost that job. She had stable housing and had the nurse's phone number to call about home health care.

The Department conservatorship worker created the family service plans in this case. The conservatorship worker testified that Tina was returned to Mother in 2016. After being returned to Mother's care, Tina was hospitalized twice for malnutrition before the Department intervened and removed Tina from Mother's care a second time. When Tina was first removed Mother tested positive for cocaine and marijuana. The worker testified that it appeared when the Department was involved, Mother remained drug free, but when they removed her child she began using drugs again.

Mother did not follow recommendations from her drug and alcohol assessments, was not employed, did not maintain stable housing, did not attend parenting classes, and did not submit to every drug test the Department requested. The conservatorship worker testified that Tina's medical condition at the time she came into care the second time indicated that Tina's life was in danger. The Department observed that Mother had not bonded with Tina as well as Mother had bonded with her other children; Mother missed visits with Tina but she did not miss visits with her other children. Mother brought clothes and toys for her son when she visited, but Mother did not bring those things for Tina.

At the time of trial Tina had been living in the same foster home for over a year. Despite not being fully verbal, Tina was able to express her bond with the foster parent, calling her, "Mom." The conservatorship worker had seen Tina "get really excited" when the foster mother came to get her. Tina did not like to be away from her foster mother for long. The foster mother is a registered nurse who is trained to care for the GJ tube Tina uses for nourishment in addition to Tina's other medical needs. The foster mother also showed Tina love and cared for her emotional needs

11

and will be able to do so in the future. The foster mother enrolled Tina in school and ensured that she was placed in a classroom setting according to Tina's needs. The foster mother was knowledgeable about programs available to assist her and to support Tina's needs. At the time of trial the foster mother was not employed, but was maintaining a stable home with other nurses living in the home "24/7." The foster mother's mother also lived in the home and provided a support system for Tina.

The Child Advocate began working on the case in 2013, when Tina was just over one year old. When the Advocate first visited Tina she behaved like a newborn, unable to control her head, or track with her eyes. The Advocate testified that at one year old Tina had obvious cognitive and physical delays. In the first case, in 2013, the parties entered into a mediated settlement agreement that sent Tina back home with Mother. The Child Advocate opposed the agreement. The Advocate wrote a letter to the trial court expressing her opposition to the plan set forth in the mediated settlement agreement.

The letter noted that during the Advocate's visits Tina was clothed, clean, and appeared to be getting nutrition. The Department provided nursing care 16 hours per day Monday through Friday. There was no nurse on the weekends. Although Tina's basic needs were being met, the Child Advocate expressed concern about Tina's placement with Mother. Tina was non-verbal, and no speech therapist or plan for a speech therapist was in place. At the time Tina was returned, Mother had given birth to her fourth child. All of the Advocate's previous concerns remained, including "the family's continued refusal of nursing care (prior to [Tina]'s placement), the possible physical abuse and confirmed physical and medical neglect of [Tina], the intensive medical needs of [Tina], [Mother]'s inconsistent visits and interaction with [Tina], her failure to provide for any of [Tina]'s needs while in care, as well as

12

[Grandmother]'s unwillingness to attend training to care for [Tina]."

Tina had regular appointments with several specialists, including a neurologist, gastroenterologist, physical therapist, and speech therapist. Mother was not taking Tina to these appointments. Since Tina came back into the Department's care she was attending kindergarten, but was limited in her verbal skills. Tina had difficulty walking, and the Advocate could "tell that she's not been able to do it very long." Tina has bonded with her foster mother and grandmother; Tina's routine was centered around her and her needs. The foster mother was involved in Tina's education and medical appointments. She was aware that Tina could pull out her GJ tube "at any moment" and watched her closely in light of this possibility. The foster mother had training and experience with other children with special medical needs and stood ready to adopt Tina.

Another caseworker, newer to the case, testified that she met with Mother once per month to discuss Mother's progress on the family service plan. Mother had been referred to the Wellness Center for substance abuse treatment, but was discharged from the center without completing treatment. Mother indicated to the caseworker that it would be in Tina's best interest for Tina to remain with the foster mother. Grandmother, with whom Tina's siblings were placed, declined placement of Tina due to her special needs. The caseworker testified that there had been a material and substantial change between Tina's condition when she was returned to Mother and her condition when she came into the Department's care for a second time.

At the end of trial the trial court found by clear and convincing evidence that Mother's rights should be terminated on the predicate grounds of endangerment and failure to comply with the family service plan. The trial court further found clear and convincing evidence that termination of the parent-child relationship between

Mother and Tina was in Tina's best interest.

ANALYSIS

In two issues Mother challenges the factual sufficiency of the evidence to support the trial court's findings on endangerment and best interest of the child.

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so

14

significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we do not substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## I.  Collateral Consequences of Endangerment Findings

Mother concedes that sufficient evidence supports the predicate termination finding that she failed to complete the services required by the family service plan under Texas Family Code section 161.001(b)(1)(O). Unchallenged predicate findings are binding on the appellate court. *See In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Mother, however, urges us in her first issue to review the factual sufficiency of the evidence to support the trial court's endangerment findings because they may have negative collateral consequences. *See In re J.J.G.*, No. 14-15-00094-CV, 2015 WL 3524371, *4 (Tex. App.–Houston [14th Dist.] June 4, 2015, no pet.) (mem. op.). Those consequences include the binding nature of the endangerment findings on the best-interest analysis in this case and their potential to support termination of her relationship with another child under subsection M in a future case. *Id*. Texas Family Code section 161.001(b)(1)(M) permits termination of parental rights based on a finding that the parent's previous conduct violated subsection D or E or substantially equivalent provisions of another state's law. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M). Because the current appeal is the only possible appeal of the endangerment findings, which would be binding in a future proceeding, we will address Mother's arguments. *See In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 WL 1719133, at *8 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) (mem. op.).

15

## II.     Endangerment Findings

The trial court's decree of termination was based on Texas Family Code section 161.001(b)(1)(D) and (E) in addition to subsection O, with the court finding that Mother had:

> • Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (subsection D); and
>
> • Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (subsection E).

Both subsections D and E require proof of endangerment. "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

Endangerment under subsection D may be established by evidence related to the child's environment. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D. *In re M.R.J.M.*, 280 S.W.3d at 502.

Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re S.R.*, 452

S.W.3d at 361. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection E, however, courts may consider conduct both before and after the Department removed the child from the home. *See In re S.R.*, 452 S.W.3d at 361.

Mother contends the medical evidence admitted at trial is insufficient to prove that she "consciously missed enough medical appointments so as to endanger Tina." Mother accurately notes that 17,250 pages of medical records were admitted at trial without objection. Mother argues, however, that the records were "duplicative, not in chronological order, and irrelevant." The medical records are voluminous and are not in chronological order, but are relevant to the trial court's endangerment finding. Approximately one half of the records were generated during Tina's first year when she spent eleven months in two different hospitals.

The medical records reflect that Tina, born in July 2012, was not discharged from the hospital until June 17, 2013. While in the hospital Tina experienced multiple surgeries in addition to care for her nutritional and respiratory issues. At the time of Tina's discharge Mother was given detailed instructions on how to feed Tina through the GJ tube. The hospital nurse met with Mother and her boyfriend at the

17

time of discharge. Mother said she understood the importance of taking Tina to follow-up appointments and the importance of never running out of Tina's medications or formula. Mother was informed that the home health company would supply the formula, and Mother was made aware of the risk to Tina as she was on oxygen. It was explained to Mother that if she took Tina out of the house she needed to take enough oxygen in the portable tank. The nurse also discussed physical and speech therapy that Tina would need. Mother asked the nurse if she could put a full 24-hour serving of formula in the feeding bag at a time, alleviating the need to feed Tina at intervals throughout the day. The nurse told Mother she absolutely could not feed Tina a full 24-hour serving at a time because the bag needed to be cleaned and rotated every four hours. Mother told the nurse she understood the instructions.

The medical records contain nurse's notes from July 1, 2013, July 8, 2013, and July 9, 2013, noting that Mother had missed appointments for Tina and that messages were left for Mother explaining the importance of keeping medical appointments. Another appointment was scheduled July 17, and it was noted that, "Should the patient miss an appointment CPS will be consulted." Before that appointment could be kept, on July 13, 2013, Tina was re-admitted to the hospital. Two days before admission Tina had a cough and fever of 102 degrees.

Tina was still in the hospital on August 8, 2013, the date of the first Department referral. The medical record notes that Tina had been discharged from Neo-natal Intensive Care after an eleven-month hospitalization for respiratory disease and several gastrointestinal surgeries. When re-admitted in August, Tina appeared lethargic and worsened overnight, requiring intubation. The treating physician noted that a medical history could not be obtained because, "patient is an infant and no family at bedside." A chaplain's note stated that Mother "became upset a few days ago and has not been back. [Mother] seems to be confused as to the

needed care her daughter required and has some misunderstandings related to the fact that her child was intubated." Tina could not be discharged until August 15, 2013 because the hospital social workers could not discharge her until they resolved "home issues." Hospital staff sought a psychiatric consultation to evaluate Mother for schizophrenia, but Mother refused.

Approximately one month later, on September 18, 2013, Tina was admitted again to the hospital with seizures. The consultation notes reflected that Tina's sodium levels were low. The notes further reflected that Mother was using the formula provided to fill the GJ tube bag with water plus a "scoop" of formula. Mother was unsure the amount of water and formula she was adding to the bag and was unable to explain the proper mixing instructions. The treating physician suspected that the seizures were due to improper mixing of the formula, which led to hyponatremia, an unsafe level of sodium in the blood. The home health care provider to whom Mother had been referred had not seen Tina since the last discharge from the hospital.

A progress report on October 8, 2013 noted that the Department designated Grandmother to care for Tina after discharge, but Grandmother refused to learn how to care for Tina's GJ tube, oxygen needs, or medication. The treating physician referred a discharge plan to the Department because Tina did not have a suitable caregiver. Tina was again admitted to the hospital on November 22, 2013 with seizures and was discharged on December 9, 2013 to the foster parent.

On October 12, 2014, ten months later, the foster mother brought Tina to the hospital because the GJ tube had become dislodged. Again, in February 2015, the GJ tube was dislodged and replaced at the hospital. According to the medical records, the foster mother was caring for Tina during these two admissions. Two other times in 2015, April and September, the foster mother took Tina to the hospital

19

because the feeding tube became dislodged.

In December 2015, Mother had regained custody of Tina and took her to the nutritional clinic. Tina was gaining weight and Mother was handling feeding. On January 27, 2016, Mother and the home health nurse took Tina to a nutrition clinic. On April 11, 2016, Tina was again admitted to the hospital after three days of vomiting. At this time the social work CARE team was consulted due to concerns of neglect due to Mother's lack of knowledge of Tina's medical care and feeding regimen. The report noted that Tina was at high risk for neglect and/or abuse, but determined that a Department referral was not warranted at the time. The CARE team expressed a desire to follow the family to monitor compliance and to screen for additional risk factors. Tina was discharged on April 20, 2016. The second Department referral came on September 27, 2016.

On October 17, 2016, Tina was seen at the nutrition clinic. The nurse noted that Tina had two recent hospitalizations at Texas Children's for weight loss. On November 6, 2016, Tina had another surgery to replace the GJ tube. On November 28, 2016, Tina was admitted to the hospital with significant weight loss. The physician's notes reflected that the feeding had been erroneously administered through the wrong tube overnight. The medical records reflect that the treating physician had a "high concern for patient's social situation, so medical neglect has to remain on our differential." Another report questioned whether Mother's difficulty managing the GJ tube feeds was "intentional noncompliance" or "misunderstanding." A note on the December 3, 2016 record from the social worker instructed that Tina was not to be discharged without Department clearance. Several notes during the November/December hospitalization reflect that Mother was required to undergo training before Tina could be discharged, but that Mother was not compliant with training.

The medical records reflect the severity of Tina's medical issues and Tina's need for frequent medical visits. The records further reflect a trend of improvement when Tina was with the foster parent or hospitalized, and of decline when Tina was with Mother. Mother was unable to feed Tina properly or keep up with Tina's medical appointments. While Tina was hospitalized Mother was frequently absent from the hospital. When Mother was at the hospital she caused disturbances. Tina's discharge was often postponed due to Mother's absence or her inability or refusal to learn how to care for Tina.

Neglect of a child's medical needs endangers the child. *In re S.G.F.*, No. 14-16-00716-CV, 2017 WL 924541, at *6 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.) (mem. op.). A parent's failure to provide appropriate medical care for a child may constitute endangering conduct for purposes of subsection E. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.). As detailed above, Tina needs almost constant supervision to ensure that her feeding tube is not dislodged. Tina's formula must be properly measured and administered not only to promote weight gain, but to avoid seizures. Tina requires daily oxygen, weekly physical and speech therapy, and frequent medical visits. Although hospital staff and social workers met with Mother and Grandmother several times and made concerted efforts to educate them about Tina's condition and the extensive care she required, Mother and Grandmother were unwilling, or unable, to learn how to properly care for Tina's medical needs.

Contrary to Mother's assertion that the medical records were irrelevant, the records provide ample support for the trial court's finding that Mother endangered her child's life by failing to attend necessary medical appointments. Mother also failed to attend to her daughter's needs while the child was hospitalized, and failed

21

to take advantage of the substantial learning opportunities provided by the hospital and the Department. The hospital records show a pattern of improvement while Tina was with her foster mother. To be sure, Tina was hospitalized while in foster care, but for dislodging of the GJ tube, which the record showed is to be expected with a young child. The hospitalizations that occurred while Tina was in Mother's care were due to improper formula mixing and neglect of Tina's physical needs.

Moreover, Mother demonstrated a pattern of refraining from illegal drug use only when she knew she would lose her child if she used drugs. According to the caseworker's testimony, Mother was unable to refrain from drug use after Tina was returned to her. A parent engaging in illegal drug activity after she knows her parental rights are in jeopardy is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered a child's well-being. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

In view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Mother had engaged in conduct that endangered Tina's physical or emotional well-being in violation of section 161.001(b)(1)(E). *See In re J.O.A.*, 283 S.W.3d at 345.

Because we have determined that there is factually sufficient evidence supporting the trial court's predicate finding under subsection E, we do not need to consider whether there is sufficient evidence supporting the finding under subsection D. *See In re J.J.G.*, 2015 WL 3524371 at *4. We overrule Mother's first issue.

## III.    Best Interest of the Child

In her second issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the child.

22

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also* Tex. Fam. Code Ann. § 263.307(b) (West Supp. 2017) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and the burden is on the Department to rebut that presumption. *In re U.P.*, 105 S.W.3d at 230. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

## A.    Desires of the child

At the time of trial Tina was five years old. When a child is too young to express her desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by the foster family, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Tina is living with her foster parent who is a registered nurse and is trained to care for Tina's special medical needs. Tina is nonverbal and developmentally behind

23

for her age. Mother admits there is no evidence that Tina has bonded with her or Tina's siblings. The medical records reflect that when Tina was returned to Mother her medical condition declined to the point that Tina's life was in danger. According to the caseworker, Mother expressed that it was in Tina's best interest to remain with the foster parent.

**B.      Present and future physical and emotional needs of the child and present and future physical and emotional danger to the child**

Mother admits that her failure to follow the family service plan when Tina came into care a second time, in addition to Mother's positive drug test results, support the best-interest finding. Mother further recognizes that Tina has multiple medical needs that will continue in the future, requiring frequent medical visits and therapy. Mother argues, however, that she was able to provide Tina the care she needed with the help of an in-home nurse.

The medical records reflect that Mother was unable to provide the care Tina needed. The hospital staff noted Mother's misunderstanding of how to feed Tina in addition to Mother's resistance to training and assistance from medical professionals. A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Mother argues that if she had more time she could improve in her care for Tina. Mother was given an opportunity when Tina was returned to her care, but refused the help the hospital offered. In making its best-interest finding, the trial court reasonably could have credited the evidence of Mother's promises to learn about Tina's care and decide they justified returning Tina a second time, but we cannot say the trial court acted unreasonably in finding the child's best interest lay

elsewhere. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the child's best interest for the considered judgment of the fact finder.

**C.    Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the child by the individual seeking custody**

These factors compare the Department's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

When Tina was with Mother her hospitalizations were primarily the result of mismanagement of formula feedings or neglect of other medical needs. Mother recognizes she does not have the same training as the foster mother, but argues she can devote all of her time to Tina because her other three children no longer live with her.

In contrast, the foster mother is a registered nurse, and Mother admits the foster mother is able to meet all of Tina's physical and emotional needs. When Tina was with the foster mother she was taken to the hospital twice because the GJ tube had become dislodged. Other than the dislodged GJ tube, which is not uncommon with an active child, Tina was thriving with the foster mother. The foster mother not only cared for Tina's medical needs, but ensured that she attended school and was in classes that were appropriate for a child with Tina's special needs.

**D.    Programs available to assist in promoting the child's best interest**

In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*,

402 S.W.3d at 249. Mother admitted she did not comply with the family service plan, "dropped out" of classes recommended as a result of the drug assessment, and failed to maintain stable housing or employment. Mother failed to demonstrate the ability to provide Tina with safety or stability, as is presumed by the Family Code to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a) (West 2015).

**E.  Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions**

Mother argues that Tina came back into Department care because of "missed appointments and malnutrition in October and December 2016." As an excuse, Mother claims neither she nor the in-home nurse were aware of any missed doctor's appointments. Mother also argues that Mother was concerned with Tina's weight loss and that it was primarily due to a leaking GJ tube.

The medical records tell a different story. Tina is a child who requires weekly doctor's appointments and therapy visits. If Mother or the nurse were unaware of specific appointments, they would have known that Tina needed to see a medical professional each week. The malnutrition suffered by Tina was not only a leaking GJ tube, but also was a result of improper mixing of formula despite instruction on the importance of properly mixing Tina's formula.

Mother's pattern of conduct reflects that termination is in the best interest of the child. In view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in Tina's best interest.

## CONCLUSION

Because Mother failed to challenge the predicate ground for termination under section 161.001(b)(1)(O), the trial court's finding under this section alone suffices

to sustain a predicate ground for termination of Mother's parental rights. Nonetheless, Mother having requested and this court having conducted a collateral-consequences review of the endangerment findings that could support termination of Mother's relationship with another child under subsection M in a future case, we hold the evidence factually sufficient to support the predicate termination finding under subsection E. And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in the child's best interest so that the child could promptly achieve permanency through adoption. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.). We overrule all of Mother's appellate challenges.

We affirm the decree terminating Mother's parental rights.

/s/    William J. Boyce
Justice

Panel consists of Chief Justice Frost and Justices Boyce and Busby.